# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 19, 2018

Plaintiff-Appellee,

v

No. 339890
Sanilac Circuit Court

KENNETH JAMES THOMPSON II,

LC No. 17-007636-FC

Defendant-Appellant.

Before: FORT HOOD, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of conspiracy to commit armed robbery, MCL 750.157a, MCL 750.529; home invasion, first-degree, MCL 750.110a(2); conspiracy to commit home invasion, first-degree, MCL 750.157a, MCL 750.110a(2); unlawful imprisonment, MCL 750.349b; and assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84. The trial court sentenced defendant as a habitual offender, second offense, MCL 769.10, to concurrent prison terms of 10 to 30 years for each conspiracy conviction and for the first-degree home-invasion conviction, 5 to 22½ years for the unlawful imprisonment conviction, and 2 to 15 years for the AWIGBH conviction.[1] Defendant appeals as of right, and we affirm.

Defendant committed these crimes with Irvonte Woods and Keita Palmer, as well as Heather Amnath, on May 8, 2016. Amnath testified against defendant pursuant to a plea agreement. She established that she and defendant made a plan whereby she would lure Kurt Wirth, her friend, to the door of his home at which point defendant, Woods and Palmer, whom she had observed were armed with guns, would rush Wirth. In fact, Wirth was hit with an axe on the head, was taken to the basement where he was kicked and punched, and was then brought upstairs where he was tied up and blindfolded. Marijuana, guns and money were taken from Wirth's house during the robbery.

Defendant first argues that the evidence was insufficient to convict him of the crimes. We disagree.

---

[1] The jury acquitted defendant of charges of armed robbery and assault with a dangerous weapon.

-1-

This Court reviews de novo a defendant's challenge to the sufficiency of the evidence. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010).

To satisfy due process, a conviction must be based on evidence proving guilt beyond a reasonable doubt. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010). This Court will review "the evidence in the light most favorable to the prosecutor[ ]" to ascertain "'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010), quoting *People v Hardiman*, 466 Mich 417, 429; 646 NW2d 158 (2002). "[D]irect and circumstantial [evidence], as well as all reasonable inferences that may be drawn therefrom," can support a defendant's conviction. *Id*.

Defendant contends that the evidence was insufficient to convict him of conspiracy to commit armed robbery and conspiracy to commit first-degree home invasion.[2] He asserts that the cellular telephone records did not definitively establish that he agreed with Amnath, Woods or Palmer to participate in the home invasion and armed robbery of Wirth, and that Amnath's testimony that defendant was involved in the planning and execution of the crimes was motivated by her plea bargain with the prosecution.

The elements of first-degree home invasion are as follows:

(1) the defendant either breaks and enters a dwelling or enters a dwelling without permission; (2) the defendant either intends when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling actually commits a felony, larceny, or assault; and (3) while the defendant is entering, present in, or exiting the dwelling, either (a) the defendant is armed with a dangerous weapon, or (b) another person is lawfully present in the dwelling. [*People v Bush*, 315 Mich App 237, 244; 890 NW2d 370 (2016).]

Moreover, the elements of armed robbery are as follows:

(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7-8; 742 NW2d 610 (2007).]

"A conspiracy is a partnership in criminal purposes." *People v Blume*, 443 Mich 476, 481; 505 NW2d 843 (1993) (citation and quotation marks omitted). "'Establishing a conspiracy

---

[2] To the extent defendant challenges the sufficiency of the evidence to support his armed robbery conviction in his brief on appeal, we note that the jury acquitted defendant of armed robbery.

requires evidence of specific intent to combine with others to accomplish an illegal objective.'" *People v Izarraras-Placante*, 246 Mich App 490, 493; 633 NW2d 18 (2001), quoting *Blume*, 443 Mich at 481. "[T]here must be proof demonstrating that the parties specifically intended to further, promote, advance, or pursue the unlawful objective." *People v Justice (After Remand)*, 454 Mich 334, 347; 562 NW2d 652 (1997). It is not required that each defendant have knowledge of all the ramifications of a criminal conspiracy. *People v Hunter*, 466 Mich 1, 7; 643 NW2d 218 (2002). "Direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties." *People v Lowery*, 274 Mich App 684, 693; 736 NW2d 586 (2007), quoting *Justice (After Remand)*, 454 Mich at 347.

Here, Amnath's testimony provided direct evidence that defendant conspired to commit armed robbery and first-degree home invasion of Wirth's home. Amnath stated that she and defendant spoke about the crimes for four or five days beforehand, beginning with defendant asking her whether she wanted to be involved in robbing Wirth's home. Amnath explained that the robbery was consistent with the plan. Amnath did indeed negotiate a favorable plea bargain, receiving a 3 to 15-year sentence after pleading guilty to unarmed robbery and having eight other charges, including home invasion, armed robbery, and felonious assault, dropped in exchange for her testimony against defendant. However, the jury was informed of Amnath's plea arrangement, and this Court will not interfere with the jury's role of determining a witness's credibility. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). Therefore, even standing alone, Amnath's testimony well supported the jury's finding that defendant was guilty of conspiring to commit armed robbery and first degree home invasion.

However, the jury's verdict was also amply supported by evidence gathered from the participants' cellular telephones. It was established that the cellular telephones of defendant and Amnath had communicated 99 times from May 6, 2016 through May 8, 2016, and that only eleven percent of the communications were initiated by Amnath. Text messages between defendant and Amnath, and between Wirth and Amnath, demonstrated that defendant and Amnath were interacting in concert to act against Wirth. Specifically, on May 5, 2016, three days before the armed robbery and home invasion, Amnath volunteered to defendant, "Just tell me what you need me to do and I will[,]" and defendant responded, "We need to hit a lick out here in the country I know yu know sum1 even if yu kool with[.]" At trial, Amnath explained that she learned that to "hit a lick" meant "to rob a home," specifically Wirth's home in this case. Defendant also sent a text to Amnath stating that "t n I'll do the rest n cut yu [i]n[.]" The following two days defendant and Amnath discussed Wirth's schedule and the timing and circumstances of when they would act. Amnath also discussed her pressing need for money and her plan to attend a gathering in Wirth's deceased mother's memory at Wirth's home on May 8, 2016.

On the afternoon and evening of May 8, 2016, defendant and Amnath continued to discuss how to take action against Wirth and Amnath regularly updated defendant about the events of Wirth's gathering. Amnath told defendant that the last guests were leaving and that defendant was "going to miss [his] opportunity[.]" At 11:17 p.m., Amnath told Wirth that she would be back at his home in 15 minutes, and at 11:41 p.m., Amnath told defendant that Wirth would not let her in; defendant responded, "is it clear [e]." This text message evidence indicated that there was an effort by defendant and Amnath over the days preceding the robbery/home invasion to manipulate Wirth and find the best time to execute their plan. Further, the evidence

supported Amnath's claim that the plan concluded with the armed robbery of Wirth and the invasion of his home.

Defendant points out that both he and his fiancé, Ashley Krajenke, testified at trial that defendant's cellular telephone had been lost or stolen before May 2016, and that defendant then used Krajenke's cellular telephone number. However, the police conducted an analysis of defendant's cellular telephone patterns, particularly analyzing the consistency of the contacts made with defendant's cellular telephone from March 1, 2016 through May 10, 2016, and noting the cellular telephone's top 10 contacts, which included Krajenke, Amnath, and a West Virginia number where defendant had lived. Consequently, Detective Sergeant Randy Khan with the Michigan State Police testified regarding his opinion that defendant himself was using his cellular telephone from March 1, 2016 to May 8, 2016, "including before, during and after" the home invasion. Additionally, Amnath's testimony that she communicated with defendant by way of his cellular telephone was supported by the text message evidence.

Further, "[w]hat the conspirators actually did in furtherance of the conspiracy is evidence of what they had agreed to do." *Lowery*, 274 Mich App at 693, citing *Hunter*, 466 Mich at 9. Here, the events surrounding the home invasion/armed robbery, as described by Amnath, indicated that she and defendant had agreed to commit the crimes. Amnath said that she had been texting with defendant while she was at Wirth's gathering on the day of the robbery. She also said that she complied with defendant's directions to pick him up and also to pick up his two "little brothers" from a different city and that when she did so, she saw them put guns in their pockets. According to Amnath, defendant then directed her to transport all of them to a location near Wirth's home. Amnath said that the plan was to deliver defendant and the men to an area near Wirth's home so that they could charge at the door when Wirth came to the door to sell her marijuana. Amnath explained that she changed her mind about participating in the crimes and attempted to leave after first approaching Wirth's door, but returned to Wirth's door and successfully drew Wirth out after defendant demanded that she return and threatened her life. Wirth indicated that while Amnath was at his door she delayed and spoke loudly until someone kicked open the door and struck him with what he thought was an axe. Amnath said that stolen guns and marijuana were placed in her vehicle after the robbery/home invasion, and that she then dropped defendant off at his home. She was ostensibly returning Woods and Palmer to their homes but said that she intentionally drove at a high rate of speed to alert the police. She was in fact pulled over and the episode ended. These concerted actions, including the cellular telephone communications, the transport of participants, the execution of the crimes, and the aftermath, demonstrate that Amnath and defendant, as well as Woods and Palmer, had agreed to coordinate their actions for the purpose of conducting a home invasion of Wirth's residence and robbing him while armed. Accordingly, the jury's verdict, convicting defendant of conspiracy to commit armed robbery and first degree home invasion, was amply supported by the record evidence.

Defendant next argues that the evidence was not sufficient to support his convictions for first-degree home invasion, unlawful imprisonment, and AWIGBH because the evidence did not demonstrate that he was in Wirth's home at the time of the crimes. With regard to unlawful imprisonment:

> (1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:

-4-

(a) The person is restrained by means of a weapon or dangerous instrument.

(b) The restrained person was secretly confined.

(c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony. [MCL 750.349b.]

The elements of AWIGBH are "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014). "[I]t is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Wirth observed defendant during trial and did not believe that defendant looked like one of the assailants. Moreover, defendant was not initially a suspect because he did not match Wirth's description of the assailants. However, Wirth could not tell how many intruders were in his home, and knew there were at least two others besides Amnath. In contrast, Amnath provided definitive testimony that defendant participated in the home invasion, unlawful imprisonment, and AWIGBH.[3] Specifically, Amnath recalled that Wirth came out of his home when she knocked on the door and defendant, Woods and Palmer then entered the home by "bust[ing] through the door." Wirth recalled meeting with Amnath at the door when someone kicked open the door and struck him with what he thought was an axe. Wirth stated that a man forced him to the basement while Amnath was walking out the door. Wirth reported that he was kicked and punched and "they" told him to stay on the floor where he remained for a few minutes. Amnath said that she was upstairs in the kitchen, while Woods and Palmer went downstairs and defendant was upstairs "barking out orders." Amnath stated that the two men brought Wirth upstairs at which point defendant directed them to tie Wirth up. Wirth said that he was led upstairs to his son's bedroom where he was tied up. After the robbery, the police observed drops of blood and a pool of blood downstairs, blood on the steps and in the hall leading to the bedroom, a bloody pillow and bandana, and straps and a dog leash. Moreover, testimony regarding the locations of the cellular telephones at the time they were used for

---

[3] The jury convicted defendant under an aiding and abetting theory. Accomplices to crimes may be prosecuted as if they committed the crime under the theory that they aided and abetted the crimes. *People v Robinson*, 475 Mich 1, 5-6; 715 NW2d 44 (2006). A conviction under an aiding and abetting theory requires that:

(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*Id*. at 6 (citation and quotation marks omitted).]

communication also supported Amnath's testimony that defendant was a participant in the crimes. Both Amnath and defendant made calls on their cellular telephones from the area near Wirth's home on May 8, 2016 at 10:22 p.m. At 10:42 p.m., both Amnath and defendant used their cellular telephones near Port Huron, Michigan where they had picked up Woods and Palmer, and at 11:43 p.m., both Amnath and defendant used their phones near Yale, Michigan.[4] Moreover, defendant's phone was within a mile of Wirth's home at 11:58 p.m. on May 8, 2016. Therefore, Amnath's testimony, supported by the testimony of Wirth and the physical evidence, as well as the cellular telephone evidence, amply supported the jury's determination that defendant was a participant in the home invasion, as well as the unlawful imprisonment and violent assault of Wirth.

Next, defendant argues that the cellular telephone records were not properly authenticated before being admitted into evidence.

This Court reviews a trial court's ruling on the admissibility of evidence for an abuse of discretion. *People v Briseno*, 211 Mich App 11, 14; 535 NW2d 559 (1995). The trial court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *People v Wiley*, ___ Mich App ___, ___; ___ NW2d ____ (2018) (Docket Nos. 336898, 338870); slip op at 21.

MRE 901 requires that an item be authenticated before it is admitted into evidence. Specifically, MRE 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Here, defendant argues that the cellular telephone records were not properly authenticated by the detective through whom they were offered into evidence because he was not the custodian of the records or qualified to certify them since he was not an employee of the cellular telephone service providers.

Notably, MRE 902 allows for particular items to be self-authenticated without extrinsic evidence. As relevant to this appeal, MRE 902(11) provides:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
>
> **(11) Certified Records of Regularly Conducted Activity**.
>
> The original or a duplicate of a record, whether domestic or foreign, of regularly conducted business activity that would be admissible under rule 803(6), if accompanied by a written declaration under oath by its custodian or other qualified person certifying that-

---

[4] Amnath reported that she lived about 10 blocks from defendant in Yale, and that Wirth lived about 10 miles away.

(A) The record was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(B) The record was kept in the course of the regularly conducted business activity; and

(C) It was the regular practice of the business activity to make the record.

A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

MRE 803(6) provides, in pertinent part, an exception to the rule against hearsay:[5]

**(6) Records of Regularly Conducted Activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.

Here, the cellular telephone records met the requirements of MRE 803(6) where they were "record[s]" that were "kept in the course of a regularly conducted business activity," and "it was the regular practice of" the cellular telephone companies, as demonstrated by the certifications from each provider, to keep the cellular telephone records. Thus, the cellular telephone records would be admissible under MRE 803(6). Because the records were admissible under MRE 803(6), they were self-authenticating under MRE 902(11) if "accompanied by a written declaration" by the custodian certifying that the records were "made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;" that the records were "kept in the course of the regularly conducted business activity; and" that "[i]t was the regular practice of the business activity to make the record." Specifically, Verizon's custodian of records submitted a certification of records stating that the records complied with the explicit three requirements of MRE 902(11), as did the custodian of records for AT&T,[6] and T-Mobile. These certificates of authenticity correspond to

---

[5] MRE 802 provides that "[h]earsay is not admissible except as provided by law."

[6] Although the AT&T letter did not explicitly use the language of MRE 902(11), like the other companies, the verification stated that the custodian of records maintained and routinely relied

the phone records of trial exhibits 10, 11, and 12, which the record reflects were used to compile exhibit 17. Although Detective Sergeant Nathan Smith was not the custodian of the records or employed by the cellular telephone companies, the language of MRE 902(11) specifically allows that the records could be self-authenticated. Accordingly, where the verification of authenticity certificates complied with MRE 902(11), we discern no error with regard to the trial court's decision to admit the evidence.

Finally, defendant argues that the trial court erred in awarding restitution. At sentencing, the trial court ordered defendant to pay $1,338 in restitution to Wirth, but defendant objected and the trial court agreed to an evidentiary hearing to determine the amount of restitution as recorded in the initial judgment of sentence. However, the trial court later amended the judgment of sentence to exclude any reference to restitution, given that Wirth was not requesting restitution. Therefore, there is no order for restitution for this Court to review.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Deborah A. Servitto
/s/ Jane M. Beckering

---

on the documents in the course of his duties, and that the records were the true and correct copies of the subscriber's information.